712 So.2d 572 (1998)
STATE of Louisiana
v.
Kenneth REED.
No. 97 KA 0812.
Court of Appeal of Louisiana, First Circuit.
April 8, 1998.
*574 Doug Moreau, District Attorney by R. Christopher Nevils, Sue Bernie Assistant District Attorneys, Baton Rouge, for Appellee State of Louisiana.
Gail H. Ray, Baton Rouge, for Defendant-Appellant Kenneth Reed.
Before CARTER and FITZSIMMONS, JJ., and CHIASSON, J. Pro Tem.[1]
FITZSIMMONS, Judge.
Defendant, Kenneth Reed, Jr., was charged by grand jury indictment with the following offenses: Count I, aggravated rape, a violation of La. R.S. 14:42; Count II, aggravated burglary, a violation of La. R.S. 14:60; and Count III, attempted second degree murder, a violation of La. R.S. 14:27 and 30.1. Defendant pled not guilty to the charges. Following trial by jury, defendant was found guilty as charged on Count I, guilty of the responsive offense of unauthorized entry of an inhabited dwelling on Count II, and guilty of the responsive offense of aggravated battery on Count III. The court sentenced defendant to imprisonment at hard labor for life, without benefit of parole, probation or suspension of sentence on Count I, six years on Count II, and twelve years on Count III. The court ordered that the sentences on Counts II and III run consecutively to each other and concurrently with the sentence on Count I.[2] Defendant appealed, *575 briefing nine assignments of error.[3] Thereafter, he filed a motion with this Court to remand the case to the trial court for a hearing on his motion for new trial based on newly discovered evidence. We granted the motion to remand, directing the district court to rule on the motion and relodge the record with this Court. On remand, the trial court denied the motion for new trial as untimely filed. Defendant's appeal has been relodged with this Court. Defendant now urges the nine assignments of error briefed in his original appeal and one additional assignment of error relating to the denial of the motion for new trial based on newly discovered evidence.[4]
The record reflects that the instant offenses occurred sometime after midnight on December 27, 1991, in Baton Rouge, Louisiana, inside the home of Annette Thompson, a friend of the teenage female victim.[5] While the victim was alone in the residence asleep, two men entered the residence and brutally attacked, beat, and raped her. They also robbed the victim, tied her hands and legs, and secured a bed sheet around her neck to the point that she apparently could barely breathe. The victim "played dead," and the perpetrators left the residence. After they left, the victim managed to untie herself and run to some neighboring homes to report the offenses, as there was no telephone in Thompson's residence. The victim recognized the perpetrators as defendant and co-defendant Reese, individuals she previously had seen. During the ensuing police investigation, the victim was shown a photo lineup including defendant's picture and a separate photo lineup including co-defendant Reese's photo. From the lineups, she positively identified both men as the perpetrators. The arrests of defendant and Reese followed. At trial, the victim made positive in-court identifications of defendant and Reese.

ASSIGNMENT OF ERROR NO. ONE
In this assignment, defendant contends that the trial court erred by refusing to provide the defense with the entire initial police report of the instant offenses. Specifically, defendant claims that the defense was entitled to receive Sgt. Ericka D'Amico's report as part of the initial offense report.[6]
At a hearing conducted on May 5, 1992, the trial court ruled that Sgt. Ericka D'Amico's report was a follow-up report and that the state had complied with discovery when the state turned over the initial report by Officer Nacoste.
Additionally, the record includes a July 6, 1992 written response by the trial court to an order from this court. In the written response, the trial court stated that it conducted a hearing on June 29, 1992, at which the parties and the court reached agreement on certain matters, including the following. The state had provided the defense with a four-page report, including three pages dated December 27, 1991, relating Sgt. D'Amico's conversation with the victim and a one-page arrest report by Detective Ronnie Smith dated January 10, 1992, concerning the arrests of defendant and Reese. The court stated that it had determined the initial offense report was a two-page December 27, 1991, report by Officer Nacoste, which was given to the defendants. In conclusion, the trial court stated there were no unresolved issues related to the initial offense report.
After a review of the record, we find no merit in assignment of error one.

ASSIGNMENT OF ERROR NO. TWO
In this assignment, defendant contends that the trial court erred by denying the defense motion to suppress the victim's identification of him. Specifically, defendant appears *576 to assert that the pretrial photo lineup compiled by and displayed by Sgt. D'Amico to the victim was suggestive, and that it resulted in a likelihood of misidentification. Defendant argues that the pictures used in the lineup had been cut out in a manner to depict essentially only the faces of the persons. This deprived the victim of being able to compare the heights and weights of the persons depicted.
A defendant attempting to suppress an identification must prove the identification was suggestive, and that there was a likelihood of misidentification as a result of the identification procedure. Even should the identification be considered suggestive, that alone does not indicate a violation of the defendant's right to due process. It is the likelihood of misidentification which violates due process, not merely the suggestive identification procedure. A trial court's determination of the admissibility of identification evidence is entitled to great weight and will not be disturbed on appeal in the absence of an abuse of discretion. State v. Thomas, 589 So.2d 555, 563 (La.App. 1st Cir.1991). In determining if the court's ruling on the motion to suppress identification was correct, we are not limited to the evidence adduced at the hearing on the motion. We may consider all pertinent evidence presented at the trial of the case. State v. Smith, 95-1826, p. 4 (La.App. 1st Cir. 9/27/96); 681 So.2d 980, 985, writ denied, 96-2568 (La.3/27/97); 692 So.2d 390. Furthermore, even if it is established that a pretrial identification of an accused is the product of impermissible suggestion, an in-court identification is admissible if it has an independent basis. State v. Leagea, 95-1210, p. 6 (La.App. 1st Cir. 5/10/96); 673 So.2d 646, 650, writ denied, 96-1507 (La.11/22/96); 683 So.2d 287.
We have carefully examined the six-picture photo lineup at issue. Defendant correctly observes that each of the pictures has been cut out to display only the faces of the individuals depicted. The pictures are in black and white and are relatively the same size. They depict black men of apparently comparable ages with similar hairstyles, complexions, and facial features. After viewing the lineup itself and carefully considering the testimony of D'Amico and the victim concerning the lineup, and particularly the manner in which it was conducted, we are unable to discern any suggestiveness in the pictures, the manner in which the photographs are affixed to the folder comprising the lineup, or in any of the procedures used in conducting the lineup.
Even assuming, arguendo, that the out-of-court identification was somehow suggestive, defendant has failed to prove a likelihood of misidentification. The following factors are considered in determining if a physical lineup is reliable: (1) the witness' opportunity to view the defendant at the time the crime was committed; (2) the degree of attention paid by the witness during the commission of the crime; (3) the accuracy of any prior description; (4) the level of the witness' certainty displayed at the time of the identification; and (5) the length of time elapsed between the crime and the identification. Manson v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977); State v. Smith, 95-1826 at p. 6; 681 So.2d at 986.
The photo lineup was exhibited to the victim on December 31, 1991, only four days after the crimes. The trial was held on November 2-5, 1992, slightly more than ten months following the offenses. The victim testified that she observed the faces of both perpetrators during the commission of the offenses. She stated that the lighting in Thompson's house at the time of the incident came from the kitchen light and Christmas tree lights that were illuminated, providing her with lighting she described as about as bright as that in the courtroom. The victim knew both perpetrators from having seen them "around the neighborhood" on several occasions during a period of approximately one and one-half years preceding the perpetration of the instant offenses. She knew defendant by his nickname "Chill," and pointed out to D'Amico where he lived. The record reflects that the victim's identifications of defendant at the pretrial lineup, pretrial suppression hearing, and trial were immediate, positive, and unequivocal. In view of these facts, the out-of-court identification *577 was clearly reliable, rendering the photo lineup admissible in evidence; and the in-court identification was also admissible, without doubt having had an independent basis.
This assignment lacks merit.

ASSIGNMENT OF ERROR NO. THREE
In this assignment, defendant contends that the trial court erred by ordering him to submit to the taking of blood and saliva samples. Defendant submits that the hearing at which the trial court issued the order was not conducted in compliance with due process. Citing State v. Davis, 443 So.2d 14 (La.App. 2nd Cir.1983), defendant argues that the jurisprudence establishes the need for the state to prove that evidence exists which can be or has been tested to produce typing or identification information to justify the issuance of a court order requiring a defendant to submit to the taking of bodily fluid samples.
The record reflects that on August 31, 1992, the trial court issued an ex parte order granting the state's motion to have defendant furnish blood and saliva samples to the Coroner of East Baton Rouge Parish. Thereafter, on October 2, 1992, apparently at the request of the defense, the court held a hearing on the motion and reaffirmed its previous ruling on the motion. During the hearing, the prosecutor stated that the state's intent was to request the crime lab to undertake blood type and secretor tests. The prosecutor indicated that she would submit to the court a copy of the crime lab report, which stated that sperm was found on panties and a pillowcase from the crime scene, and on a vaginal smear in the victim's rape kit. Based on the foregoing, the prosecutor asserted that there was probable cause justifying the taking of blood and saliva samples from defendant. Based upon the arguments of counsel and the crime lab report, the court ruled there was sufficient justification for granting the motion for purposes of testing and comparison with the referenced evidentiary items.
The victim was positive of defendant's identity as one of the perpetrators of these offenses. George Schiro, who qualified and was accepted by the trial court as an expert in the field of forensic serology, tested defendant's blood and saliva samples, items of physical evidence recovered at the crime scene, and items in the victim's rape kit, including the victim's blood sample. The only item in the rape kit on which he detected any seminal fluid was the vaginal smear, and he was unable to perform any secretor test on this item. According to Schiro's testimony, the seminal fluid could have come from any male in the world; and the sperm Schiro found on the vaginal smear could not be connected with this case at all. On a bedsheet, Schiro detected human blood with B antigenic activity. Although Schiro determined defendant could not have been the contributor of this stain, neither the victim nor Reese could be excluded as the contributor. Schiro indicated that this stain could have been from anyone within the sixteen percent of the black population having type B blood.
There is nothing in the record indicating that the intrusion required to obtain the samples from defendant was anything other than minimal. Even assuming, arguendo, that the trial court erred by granting the motion, we are convinced that the error was harmless beyond a reasonable doubt and did not contribute to the instant verdicts.
Hence, this assignment lacks merit.

ASSIGNMENT OF ERROR NO. FIVE
In this assignment, defendant contends that the trial court erred by allowing Sgt. Ericka D'Amico to give testimony relating statements the victim made to her concerning the alleged attack of the victim by defendant and his co-perpetrator. Defendant asserts that the complaint to D'Amico was not the initial complaint of the victim, who made at least two and possibly four complaints of the alleged attack.
Defendant argues that this testimony was inadmissible hearsay, and not nonhearsay under La.Code Evid. art. 801(D)(1)(d). Article 801(D)(1)(d) defines a statement as nonhearsay, if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, the statement is consistent with the declarant's testimony, *578 and is a statement of initial complaint of sexually assaultive behavior.
Defendant argues that the alleged improperly admitted testimony of D'Amico denied him a fair trial, and prejudiced him by hindering his ability to cross-examine the victim and by unfairly bolstering the state's case. More specifically, he asserts that, because D'Amico testified before the victim testified, he was unable to impeach the victim's credibility; and the effect thereof was to strengthen the victim's credibility.
Upon untying herself, the victim ran across the street from Thompson's home, banged on the door of another house, and told the occupants she had been raped and needed someone to call the police. The people inside the house told her they would call for help, but did not let her come into the house. The victim then ran to another home and knocked on the door. A man came out. The victim grabbed the man and "was telling him what happened."
In the meantime, Officer Otis Nacoste, who was on patrol in his police unit, was flagged down by the victim. The victim began relating to Nacoste what had happened to her. Sgt. Ben Odom responded to the report of these offenses by going to the scene. Odom was present and spoke with the victim along with Nacoste. The testimony of Odom and Nacoste reflects that their conversation with the victim was very brief because she passed out shortly after they began questioning her. Although Nacoste indicated that the victim went into details during the conversation, the only details he recounted from the conversation were essentially that the victim stated that she was lying on a sofa, two people entered the house, and one of them put something over her head. The victim was then transported by emergency medical personnel to the hospital where the victim spoke to Sgt. D'Amico.
When the prosecutor questioned D'Amico on direct examination concerning what the victim related to her at the hospital, counsel for defendant objected on hearsay grounds. Out of the presence of the jury, the prosecutor argued that the testimony was admissible under La.Code Evid. art. 801(D)(1)(d), as the victim's initial complaint. The defense pointed out that the victim had not yet testified and argued that, unless the victim testified prior to D'Amico and the testimony of D'Amico was consistent with that of the victim, D'Amico's testimony would be inadmissible under the article. The court agreed that the testimony would have to be consistent to be admissible as an initial complaint, but indicated that art. 801 did not dictate the order in which the witnesses had to testify. Noting that the victim had spoken to Nacoste and Odom before passing out, the court indicated that the victim had begun to relate what might be considered an initial complaint to those two officers. However, the court ruled that the victim had not actually made an initial complaint to Nacoste and Odom because she "never really had a chance to express anything" to those officers as a result of her losing consciousness. Consequently, the court ruled that the victim's statement to D'Amico was the initial complaint admissible under art. 801(D)(1)(d).
We find no abuse of discretion by the trial court in its determinations and agree with the court's ruling that the statement to D'Amico constituted the initial complaint. However, in our view, the victim's initial complaint began with the brief statements she made to Nacoste and Odom and resumed with the statement the victim gave to D'Amico at the hospital when she was able to complete her complaint in the presence of D'Amico. Cf. State v. Free, 26,267 (La.App. 2nd Cir. 9/21/94); 643 So.2d 767, writ denied, 94-2846 (La.3/10/95); 650 So.2d 1175.
Notwithstanding defendant's assertions that there were inconsistencies between the victim's testimony and the initial complaint sufficient to render D'Amico's testimony inadmissible as an initial complaint, our review discloses that several of these alleged inconsistencies represent more a matter of semantics rather than actual inconsistencies. The actual inconsistencies represent only minor divergences in testimony, which do not affect our holding in this case. Even assuming, arguendo, that the testimony given by D'Amico was erroneously admitted as an initial complaint, we are convinced that this testimony was merely cumulative of the properly admitted testimony of the victim, *579 and that it did not contribute to the verdicts. Thus, it was harmless beyond a reasonable doubt. Cf. State v. Fanguy, 94-143, p. 9-10 (La.App. 3rd Cir. 10/5/94); 643 So.2d 860, 867-68, writ denied, 94-2726 (La.4/21/95); 653 So.2d 563.
This assignment lacks merit.

ASSIGNMENT OF ERROR NO. SIX
In this assignment, defendant contends that the trial court erred by denying the defense request for an additional jury instruction.
The record reflects that during jury deliberations the jury was returned to the courtroom and requested further instructions in the following exchange:
THE COURT: MR. FOREMAN, WHAT CAN I DO FOR YOU?
THE FOREMAN: WE WOULD LIKE FURTHER INSTRUCTIONS, YOUR HONOR. WE WOULD LIKE FOR YOU TO READ US BACK THE PART ABOUT THE TESTIMONY AND THE PHYSICAL EVIDENCE. OUR INSTRUCTIONS OF HOW TO VIEW IT.
THE COURT: OKAY. HOW TO VIEW THE TESTIMONY?
A JUROR: CAN WE ASK YOU A DIRECT QUESTION?
THE COURT: GO RIGHT AHEAD. I MAY NOT BE ABLE TO ANSWER IT, BUT GO RIGHT AHEAD.
A JUROR: CAN WE CONVICT ON TESTIMONY ALONE? CAN YOU READ U.S. THE INSTRUCTIONS ABOUT THAT AND THE ANSWER TO THAT QUESTION?
In response to these inquiries, the trial court instructed the jury as to the difference between testimonial and physical evidence, and explained the jury's role in determining the facts, the credibility of witnesses, the weight to be given evidence, and whether to reject or accept testimony of any witness. Thereafter, the jury was removed from the courtroom and continued its deliberations. Counsel for defendant objected and requested that the trial court additionally instruct the jury that the jury should consider all the evidence introduced and the lack of evidence or the absence of evidence on any particular point. In overruling the objection and denying the request, the trial court noted the jurors had not requested additional instructions concerning the lack of evidence, or particularly in the context of reasonable doubt.
Based on the jurors' requests and the additional instructions given by the court, we find no error. Furthermore, in its original instruction to the jury, the trial court clearly informed the jury that, in determining guilt beyond a reasonable doubt as to each of the counts charged, the jury was to give defendant and Reese the benefit of every reasonable doubt arising out of the evidence or lack of evidence. See La.Code Crim. P. art. 804(A)(2).
This assignment lacks merit.

ASSIGNMENT OF ERROR NO. SEVEN
In this assignment, defendant contends that the evidence is insufficient to support the instant verdicts. Concerning the aggravated rape, defendant argues that the evidence supports "at the most" only a conviction for forcible rape. Regarding the unauthorized entry of an inhabited dwelling conviction, defendant points out that the victim was only a visitor at Thompson's home and that Thompson did not testify at trial. He argues that the circumstantial evidence did not negate the possibility that he had permission from Thompson to enter her home. Finally, in regard to the aggravated battery conviction, defendant asserts that, because the state failed to prove the commission of a battery with a dangerous weapon, he should have been acquitted of the attempted second degree murder charge.
In reviewing claims challenging the sufficiency of the evidence, this Court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). See also La.Code Crim. P. art. 821(B); *580 State v. Mussall, 523 So.2d 1305, 1308-09 (La.1988).
The victim gave the following testimony. At about 6:00 p.m. on December 26, 1991, she went to Thompson's home. No one was in the house when the victim entered the house. The victim waited for Thompson and fell asleep on the couch in the living room at about 10:30 or 11:00 p.m.
At about midnight or 12:30 a.m., the victim was awakened by knocking at the front door. She leaned across the couch, peeked through a window and saw defendant ("Chill") and co-defendant Reese ("Fats") standing on the porch. She also saw the car parked outside that "Kenneth rides around in all the time." The victim did not answer the door because she was alone and did not want to let anyone in, choosing instead to lie back down on the couch. She fell asleep.
Shortly thereafter, the victim heard knocking "around the windows" to the back of the house; but she did not get up to see what was going on. The victim next opened her eyes when she heard the noise of defendant and Reese running toward her inside the house from its rear. The perpetrators grabbed the victim. Reese "put [her] head in the sofa," and tried to "smother [her] to death." The perpetrators kept hitting her with their fists about her head, face and legs but never said anything to her. The victim repeatedly asked them why they were "doing this to [her]." She stated she was not Thompson, and identified herself by name. The victim continued to fight her attackers, and at some point Reese ceased pushing her head into the sofa cushion. During the struggle, false fingernails she was wearing were pulled from her fingers. All of the buttons on the victim's one piece short set were ripped off and the crotch of the garment was ripped out.
Co-defendant Reese raped the victim vaginally and anally, followed by defendant subjecting her to the same acts. The victim maintained that she continued to fight the men during the rapes.
When the perpetrators finished raping the victim, they tied her hands and feet. They "put a broom [handle] in [her] butt." Apparently not through with the victim, the perpetrators tried to put a bed sheet around the victim's head. The victim continued to fight the perpetrators as they succeeded in getting the sheet around her neck "tight enough to the point where [she] couldn't breathe." The victim then employed a strategy of lying still and "play[ing] dead." However, the victim watched defendant and Reese as they ran out of the house.
During the attack, the perpetrators took jewelry from the victim. The items included a herringbone necklace worth several hundred dollars and some rings.
The victim stated that she never gave the perpetrators permission to come into the house or to have vaginal or anal intercourse with her. She consistently maintained she was positive of their identities.
According to the victim, the front and side doors to the house were locked. She stated that she was positive the perpetrators entered from the back of the house. To the best of the victim's knowledge, there was only one way they could have entered, i.e., through a broken window in the children's room.
A few days after the offenses, Sgt. D'Amico assembled the photo lineups and displayed them to the victim. Upon viewing each lineup, the victim quickly selected the picture of defendant and that of Reese from the respective lineup and indicated her certainty in making the selections.
Casandra Chapman, who lived on the same street where the instant offenses occurred, testified that she knew defendant and Reese. During her trial testimony, she identified both men in court. She testified that on the night of December 27, 1991, she initially saw defendant and Reese sitting in a parked car. She identified State Exhibit S-8, a photograph, as depicting defendant's car, the car she observed on the night in question. Chapman stated that she saw defendant knock on the door of Thompson's residence, while Reese remained seated in the car. At the time, Chapman was going "around the corner" on her way to see a friend, Diane Milton. Later, Chapman saw defendant and Reese coming away from the side of Thompson's *581 house. The two men were moving "quickly somewhat" headed back to the car. They then drove off. According to Chapman, she "made it around the corner at least four times" and was "running back and forth" during her observations of defendant and Reese. Chapman spoke to defendant and Reese the first time she saw them, telling them that Thompson was not home. Defendant told Chapman that Thompson owed him some money and that if she saw Thompson to tell her he wanted his money. Chapman further stated that she had known defendant and Reese for about ten or more years and was certain it was them she observed.
Sgt. Ben Odom described the victim as visibly upset, shaking, injured, and crying when he came into contact with her on the morning of December 27. After the victim passed out while speaking to Odom, he began investigating the crime scene. He found an open window on the southeast corner of Thompson's residence, which he indicated was the suspected point of entry to the home. The window screen apparently had been removed and placed on the ground below the window.
The state introduced into evidence photographs (State Exhibits S-4F, S-4G) depicting the suspected point of entry. The state also introduced into evidence various items of physical evidence recovered at the crime scene, including State Exhibit S-6, a broom, which had a dark substance (fecal matter) on the handle at its tip.
At trial, defendant took the stand in his own defense. Defendant gave testimony consistent with that given by Reese, who also testified at the trial. At about 11:00 p.m. on December 26, 1991, defendant picked up Reese; and they went to Thompson's house. Defendant had loaned Thompson thirty dollars and wanted to collect the money. When they pulled up in front of the house, there was a man there. Defendant and Reese waited in the car. When the man exited the porch at the residence and left, defendant exited his car, walked up to the house, and knocked on the door. Defendant received no answer. As defendant walked down the stairs, Reese asked him if anyone was home. Defendant replied that he was not sure. Defendant, accompanied by Reese, went around the house and knocked on the window but still received no answer. Defendant and Reese got into defendant's car and left. From the residence, they went to a club where they remained until approximately 2:00 a.m. Defendant took Reese home. Defendant denied that he broke into Thompson's home, attacked or raped the victim, or returned to Thompson's home after leaving the club.
The trier of fact may accept or reject, in whole or in part, the testimony of any witness. State v. Patterson, 540 So.2d 515, 518 (La.App. 1st Cir.1989). The credibility of the testimony of a witness is a matter of the weight of the evidence. State v. Payne, 540 So.2d 520, 524 (La.App. 1st Cir.), writ denied, 546 So.2d 169 (La.1989). A determination of the weight to be given evidence is a question of fact for the trier of fact, not subject to appellate review. State v. Payne, 540 So.2d at 524; State v. Patterson, 540 So.2d at 518. In returning the instant verdicts, the jury must have rejected the testimony of defendant and Reese and chosen instead to believe the testimony of the victim and other state witnesses.
Notwithstanding defendant's assertions to the contrary, we find there clearly was overwhelmingly sufficient evidence to establish the commission of aggravated rape and not merely the responsive offense of forcible rape. See La. R.S. 14:42 prior to amendment by 1993 La. Acts, No. 630, § 1 (the law applicable to defendant's crime). Similarly, we find the evidence sufficiently established an aggravated battery, i.e., a battery with a dangerous weapon. We are convinced that the victim's testimony describing the manner in which her face was pushed into the sofa cushions and the manner in which the bed sheet was used around her neck rendered the use of the cushions and/or bed sheet dangerous weapons, i.e., instrumentalities calculated or likely to produce death or great bodily harm. See La. R.S. 14:2(3). We are also convinced that there was sufficient evidence of unauthorized *582 entry of Thompson's home,[7] notwithstanding the absence of testimony of Thompson that the entry was not authorized, based on the victim's testimony and the totality of circumstantial evidence introduced at trial.[8] Furthermore, viewing all the evidence in the light most favorable to the prosecution, we find that any rational trier of fact could have concluded beyond a reasonable doubt that the state proved all the elements of aggravated rape, unauthorized entry of an inhabited dwelling, and aggravated battery.
This assignment lacks merit.

ASSIGNMENTS OF ERROR NOS. EIGHT, NINE AND ELEVEN
In assignments eight and nine, in which defendant contends that the trial court erred by denying his motion in arrest of judgment and motion for a new trial, defendant appears to reassert the same arguments he made by means of his assignments of error numbers one through three and five through seven. Because we previously addressed and found these assignments meritless, defendant's reassertion of those same arguments in these assignments is likewise, without merit. The only remaining argument defendant makes in assignment eleven concerns the denial of his second motion for new trial alleging newly discovered evidence, a ground not urged in his initial motion for new trial.
The instant trial began on November 2, 1992, and ended three days later when the jury returned the instant verdicts. On January 12, 1993, defendant filed motions in arrest of judgment and for new trial. Both motions were denied by the trial court at a March 5, 1993, hearing. Sentences were imposed three days later on March 8. Defendant filed a motion for appeal on March 12. On August 25, 1994, we granted defendant's motion to remand the case to the trial court for a determination of whether a second motion for new trial filed by defendant based on alleged newly discovered evidence had been timely filed. The trial court then held a hearing on September 27, 1994. At the hearing, counsel for Reese (in argument concurred in by defendant's counsel) conceded that the motion for new trial alleging newly discovered evidence had been filed more than one year after rendition of the instant guilty verdicts, i.e., beyond the one-year time limitation provided in La.Code Crim. P. art. 853 for filing a motion for new trial on the ground of newly discovered evidence. However, counsel argued that the time limitation should not apply. The court deferred issuing a ruling until September 29, 1994, when it ruled that the second motion for new trial was untimely filed. Thereafter, defendant's appeal, which had previously been pending under our docket number 94 KA 0107, was relodged, and docketed under our number 97 KA 0812.
Because the record reflects that defendant's motion for new trial based on newly discovered evidence was not filed within one year of the instant verdicts, the motion was untimely filed. See La.Code Crim. P. arts. 851(3) & 853; State v. Bolton, 408 So.2d 250, 253-254 (La.1981). However, defendant argues that the one-year time limitation of article 853 unconstitutionally deprives him of his constitutional rights to judicial review and access to the courts guaranteed by La. Const. Art. I, §§ 19 & 22 and his federal and state constitutional rights to due process. We disagree, as it is the legislative prerogative to set reasonable procedural formalities and requirements such as the time limitations provided in article 853, which we do not find violative of the cited constitutional rights. See State v. Marcell, 320 So.2d 195, 198 (La.1975); State v. Denomes, 95-1201, p. 8 (La.App. 1st Cir. 5/10/96); 674 So.2d 465, 470, writ denied, 96-1455 (La.11/8/96); 683 So.2d 266. See also State v. LeBlanc, 367 *583 So.2d 335, 340 (La.1979); State v. Spain, 329 So.2d 178 (La.1976); State v. Morris, 292 So.2d 215 (La.1974). Furthermore, the article 853 time limitation must not be considered in isolation, but rather in the context of the entire post conviction process. A defendant whose right to seek review of his allegation of newly discovered evidence foreclosed under article 853 may nonetheless seek judicial redress pursuant to an application for post conviction relief filed in accordance with La.Code Crim. P. art. 924, et seq. Consequently, we reject defendant's arguments that the time limitations of article 853 unconstitutionally deprive him of his constitutional rights to judicial review, access to the courts, and due process. Cf. State ex rel. Glover v. State, 93-2330, 94-2101, 94-2197 (La.9/5/95); 660 So.2d 1189. Hence, we find no abuse of discretion by the trial court in ruling the motion was untimely filed.
These assignments lack merit.

ASSIGNMENT OF ERROR NO. TEN
In this assignment, defendant appears to concede that his failure to make or file a motion to reconsider his sentences, as required by La.Code Crim. P. art. 881.1, precludes him from challenging his sentences as excessive. Consequently, defendant advances only one argument in support of this assignment, i.e., that his sentence to imprisonment at hard labor for twelve years for the aggravated battery is patently illegal, because it exceeds the statutory maximum of ten years, and should be vacated. We agree.
La. R.S. 14:34 provides that aggravated battery is punishable by a maximum term of imprisonment of ten years, with or without hard labor. Herein, the trial court's imposition of a sentence of twelve years at hard labor for the aggravated battery is illegally excessive, since it exceeds the statutorily authorized maximum term of imprisonment. Although an appellate court is authorized to correct an illegal sentence when the exercise of sentencing discretion is not involved, correction of the illegal sentence for the aggravated battery involves the exercise of discretion and necessitates that we vacate the sentence and remand for resentencing in accordance with La. R.S. 14:34. See State v. Fraser, 484 So.2d 122, 124 n. 5 (La.1986).
CONVICTIONS AFFIRMED, SENTENCES FOR AGGRAVATED RAPE AND UNAUTHORIZED ENTRY OF AN INHABITED DWELLING AFFIRMED, SENTENCE FOR AGGRAVATED BATTERY VACATED, AND CASE REMANDED FOR RESENTENCING FOR THE AGGRAVATED BATTERY.
NOTES
[1] Judge Remy Chiasson, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] Co-defendant William Reese was jointly charged and tried with defendant on the instant charges, and the jury returned verdicts as to Reese identical to those returned as to defendant. Reese received sentences identical to those given defendant. On appeal, in an unpublished opinion, we affirmed Reese's convictions, affirmed his sentences for aggravated rape and unauthorized entry of an inhabited dwelling, vacated his sentence for aggravated battery, and remanded the case for resentencing on the aggravated battery. See State v. Reese, 94-2246 (La.App. 1st Cir. 2/23/96), 670 So.2d 804, writ denied, 96-0783 (La.6/28/96); 675 So.2d 1118.
[3] Assignment of error number four was not briefed on appeal and, therefore, is considered abandoned. See Uniform RulesCourts of Appeal, Rule 2-12.4.
[4] Although defendant numbered the additional assignment of error as number one, for purposes of clarity and simplicity, we have renumbered it as assignment eleven and will review it as such.
[5] At trial held November 2-5, 1992, the victim testified that at the time of trial she was seventeen years old and attending school.
[6] Two different spellings of the sergeant's name are used in the record, "Erica Damico" and "Ericka D'Amico." We have chosen to use the latter spelling.
[7] This court, in an unpublished opinion in State v. Reese, 94-2246 (La.App. 1st Cir. 2/23/96), 670 So.2d 804, writ denied, 96-0783 (La.6/28/96); 675 So.2d 1118, found the evidence sufficient on identical facts. I dissented from that opinion. However, the supreme court denied writs. I am constrained to follow Reese.
[8] While it is generally accepted practice to elicit the testimony of the owner or lessee of an inhabited dwelling or other structure subjected to an unauthorized entry to establish that such an entrance occurred, other evidence and even circumstantial evidence alone can establish the requisite element of unauthorized entry. See State v. Torres, 470 So.2d 319, 322 (La.App. 5th Cir. 1985).